# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **MONICA DELANE HARRIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:17-cv-01025-MHH** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Monica Delane Harris seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Harris's claims for a period of disability and disability insurance benefits. After careful review, the Court remands this matter for additional administrative proceedings.

## I. PROCEDURAL HISTORY

In November of 2014, Ms. Harris applied for disability insurance benefits. (Doc. 7-3, p. 16); (*see* Doc. 7-4, p. 17 (Box 7 – indicating disability insurance benefits claim and Box 11 – indicating date of application); *see also* Doc. 7-6, p. 2 (Application Summary)). Ms. Harris alleges that her disability began on May 16,

2014.  (Doc. 7-6, p. 2; Doc. 7-4, p. 17 (Box 11)).  The Commissioner denied Ms. Harris's claim in March of 2015.  (Doc. 7-3, p. 16; Doc. 7-5, p. 8).[1]

Ms. Harris requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 7-3, p. 12).  On July 18, 2016, the ALJ held a hearing in Birmingham, Alabama.  (Doc. 7-3, p. 33).  The ALJ issued an unfavorable decision on September 13, 2016.  (Doc. 7-3, pp. 13-15, 28).  On May 24, 2017, the Appeals Council declined Ms. Harris's request for review (Doc. 7-3, p. 2), making the Commissioner's decision final for this Court's judicial review.  *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.  STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a

---

[1] The Court notes that the Application Summary indicates that in November 2014, Ms. Harris applied for supplemental security income, not disability insurance benefits.  (Doc. 7-6, p. 2). Based on other materials in the record, including the ALJ's decision (Doc. 7-3, pp. 13-28), Ms. Harris's brief (Doc. 9, p. 1), and the Disability Determination Explanation (Doc. 7-4), the Court believes that the identification of Ms. Harris's claim on the Application Summary is incorrect and understands that Ms. Harris applied for disability insurance benefits.

scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotation marks omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or

combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that the Ms. Harris met the insured status requirements of the Social Security Act through December 31, 2018. (Doc. 7-3, p. 18). The ALJ determined that Ms. Harris had not engaged in substantial gainful activity since May 16, 2014, the alleged onset date. (Doc. 7-3, p. 18).

The ALJ concluded that Ms. Harris suffers from the severe impairment of degenerative disc disease of the lumbar spine status post diskectomy. (Doc. 7-3, p. 18). The ALJ determined Ms. Harris has the following non-severe impairments: complex regional pain syndrome, essential hypertension, vertigo, obesity, and anxiety. (Doc. 7-3, pp. 18-20). Based on a review of the medical evidence, the ALJ concluded that Ms. Harris does not have an impairment or a combination of impairments that meets or medically equals the severity of any listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 21).

In light of Ms. Harris's impairments, the ALJ evaluated Ms. Harris's residual functional capacity. The ALJ determined that Ms. Harris has the RFC to perform:

> Sedentary work . . . limited to unskilled work not involving complex instructions or procedures. The claimant cannot climb ladders, ropes or scaffolds, or work at unprotected heights or around hazardous machinery. The claimant can occasionally climb ramps or stairs, stoop, crawl, crouch and kneel. Lastly, the claimant can tolerate frequent interaction with coworkers, supervisors and the general public.

(Doc. 7-3, p. 21)

Based on this RFC, the ALJ concluded that Ms. Harris cannot perform her past relevant job as a food service worker. (Doc. 7-3, p. 26). Relying upon testimony from a vocational expert, the ALJ found that other jobs existed in the national economy that Ms. Harris could do, including optical goods assembler, wire wrapper, and stuffer. (Doc. 7-3, pp. 27, 49). Accordingly, the ALJ determined that Ms. Harris was not under a disability within the meaning of the Social Security Act at any time from May 16, 2014, the alleged onset date, through November 18, 2014, the date of the decision. (Doc. 7-3, p. 28).

## IV. ANALYSIS

On appeal, Ms. Harris maintains that the ALJ improperly evaluated her credibility under the Eleventh Circuit pain standard and disregarded the side effects of her pain medication. (Doc. 9, pp. 7-11). After considering the parties' arguments and examining the record, the Court finds that the record does not contain substantial evidence to support the ALJ's decision.

To establish disability based on testimony about subjective pain, a claimant must provide "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

In determining the existence of a disability, "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (quoting *Holt*, 921 F.2d at 1223). If an ALJ finds that the claimant's testimony is not credible, then the ALJ must explain the reason for discrediting that testimony. *Moore v. Barnhart*, 405 F.3d 1208, 1212 n.4 (11th Cir. 2005) (requiring "explicit articulation of the reasons justifying a decision to discredit a claimant's subjective pain testimony") (internal citation omitted); *Holt*, 921 F.2d at 1223 ("Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true.").

Social Security Regulation 16-3p governs an ALJ's credibility determination. That regulation provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence.

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Additionally, "[w]hen evaluating a claimant's subjective symptoms," an ALJ must consider the following factors:

> (i) the claimant's 'daily activities; (ii) the location, duration, frequency, and intensity of the [claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the [claimant took] to alleviate pain or other symptoms; (v) treatment, other than medication, [the claimant] received for relief . . . of pain or other symptoms; and (vi) any measures the claimant personally used to relieve pain or other symptoms.'

*Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)).

Ms. Harris testified that she has experienced pain and other disabling symptoms before and after her back surgery in June 2014. (Doc. 7-3, p. 45). Ms. Harris stated that she experiences a 9 out of 10 pain level at least twice a week, but her pain is usually at a level of 6 or 7 when she uses pain medication. (Doc. 7-3, p. 45).

Ms. Harris testified that she was taking Nucynta, Lyrica, and Ultram to manage pain. (Doc. 7-3, p. 46). Ms. Harris testified that because Nucynta makes her drowsy, she usually lies down usually for 30 minutes after the medication takes

effect. (Doc. 7-3, p. 46). Ms. Harris indicated that she takes Nucynta two to three times daily. (Doc. 7-3, p. 46).

The ALJ concluded that Ms. Harris's impairments meet the first part of the pain standard but not the second part. The ALJ found:

> [T]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence.

(Doc. 7-3, p. 22). The ALJ determined that Ms. Harris's subjective testimony was inconsistent with the objective medical evidence, and her daily activities diminished the credibility of her testimony concerning subjective pain. (Doc. 7-3, p. 25). The Court analyzes each category of evidence in turn.

**A. Objective Medical Evidence**

The ALJ found that the objective medical evidence sometimes conflicted with Ms. Harris's description of her symptoms. (Doc. 7-3, p. 25). An ALJ may use objective medical evidence to discredit a claimant's pain testimony. 20 C.F.R. § 404.1529(c)(2) (objective medical evidence can be "a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [her] ability to work"). But an ALJ may not "reject [a claimant's] statements about the intensity and persistence of [] pain or other symptoms or about the effect []

symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2).

The ALJ explained why he found that the objective medical evidence conflicted with Ms. Harris's pain testimony:

> After reviewing the evidentiary record in its entirety, the administrative law judge finds no reasons why the claimant would be unable to perform work within the scope of her residual capacity, as it has been defined herein. As stated earlier in the decision, the claimant presented to the consultative examination and to the hearing with a cane. However, Dr. Summerlin clearly stated that not only was the claimant not using the cane properly, the cane had not been prescribed to her by any physician. Although the claimant presented to Dr. Summerlin with an antalgic gait and a cane, her gait was perfectly normal and she was not using any assistive device when she was evaluated by Dr. Laubenthal just two days earlier (Exhibit 8F). The administrative law judge acknowledges the claimant did have a herniated disc causing impingement on the L5 nerve root prior to her discectomy in June 2014; however, three independent MRIs of her lumbar spine obtained after her surgery all showed no evidence of any recurrent or residual disc herniation or evidence of nerve root impingement at the L4/L5 level. A moderate disc protrusion was noted at the L1/L2 level, although there was no evidence of nerve root impingement and Dr. Givhan clearly indicated that this was not the cause of any of the claimant's symptoms.
>
> The evidentiary record in this case simply fails to support the claimant's alleged limitations regarding her left lower extremity. A nerve conduction study obtained in February 2015 revealed no evidence whatsoever of peripheral neuropathy, and only evidence 'most compatible' with radiculopathy (Exhibit 20F). Subsequent treatment records from Dr. Graham also document the presence of normal sensation throughout all extremities and normal or almost normal muscle strength in both her upper and lower extremities (Exhibit 17F). Not only do the overwhelming majority of the

claimant's treatment records document essentially normal physical examinations, treatment notes from Dr. Barr indicate that the claimant gave 'questionable effort' during muscle strength testing in March 2015 (Exhibit 13F).

In sum, the claimant's testimony and other allegations of pain and functional restrictions are inconsistent with the objective medical evidence.  The record does not contain objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and limitations alleged.  There are no diagnostic studies to show abnormalities that could be expected to produce such severe symptoms.  The physical findings in the record do not establish the existence of neurological deficits, significant weight loss, muscle atrophy, or other observable signs often indicative of protracted pain of the intensity, frequency, and severity alleged.

(Doc. 7-3, p. 25).  Based on this Court's review of the medical record, the ALJ has overlooked several records indicating that Ms. Harris's unresolved symptoms post-surgery may cause the pain that Ms. Harris reported.

On May 18, 2014, Ms. Harris visited DCH Regional Medical Center's Emergency Department in Tuscaloosa, Alabama and complained of back and left hip pain.  (Doc. 7-8, p. 13).  Ms. Harris indicated that her back pain had begun about one week earlier.  (Doc. 7-8, p. 13).  Ms. Harris did not know what caused this pain, but she recalled doing some heaving lifting which required her to twist her back.  (Doc. 7-8, p. 13).

Ms. Harris reported a pain level of 9 out of 10.  (Doc. 7-8, p. 7).  Ms. Harris described her pain as "shock" pain—an intensity different from what she had experienced with back strains.  (Doc. 7-8, p. 13).  Ms. Harris received several

medications to treat her acute pain including orphenadrine, ketorolac, and morphine.  (Doc. 7-8, p. 11).  Ms. Harris received a prescription for 7.5mg Norco upon discharge.  (Doc. 7-8, p. 12).

Ms. Harris continued to receive treatment for her back pain.  On May 30, 2014, Dr. Spruill gave Ms. Harris an epidural steroid injection in the left L4-L5 back area.  (Doc. 7-8, p. 24).  On June 5, 2014, Ms. Harris went to Dr. Givhan for a surgical evaluation.  (Doc. 7-8, p. 60).  Dr. Givhan's assessment of Ms. Harris included these observations:

> severe lumbar radiculopathy secondary to a large free fragment disc herniation to the left at L4-5, causing severe neural impingement.  The patient has been treated conservatively over a long period of time and has a partial foot drop.  Based on this, we think that surgical intervention is indicated.  We have discussed the risks versus benefits of left L4-5 microdiscectomy.  These include . . . bleeding, infection, anesthetic risk, injury to the existing nerve root, continued pain, recurrent disc herniation, continued weakness, and possibility of complete foot drop on the left.

(Doc. 7-8, p. 60).

On June 13, 2014, Dr. Givhan performed a L4-L5 diskectomy on Ms. Harris's back.  (Doc. 7-8, p. 48).  Following that surgery, Dr. Givhan noted on July 8, 2014, that Ms. Harris "is improving with regard to her pain, but . . . had a large herniated disc to the left at L5-S1 with severe neural impingement and still has to have symptom resolution."  (Doc. 7-8, p. 59).  At Dr. Givhan's direction, Ms. Harris attended physical therapy on July 14, 2014, at the Tuscaloosa Rehabilitation

and Hand Center.  (Doc. 7-8, p. 65).  At the appointment, Ms. Harris reported no leg pain, but Ms. Harris described other symptoms including "left lower leg and foot numbness and weakness as well as continued [lower back pain] . . . . left leg tingling and [lower back pain] increas[ing] with walking."  (Doc. 7-8, p. 65).  Ms. Harris attended at least three more physical therapy sessions in July of 2014.  (Doc. 7-8, p. 85-90).  Thus, Ms. Harris required additional treatment for pain after her surgery.

Ms. Harris returned to Dr. Givhan on July 29, 2014.  (Doc. 7-8, p. 58).  Ms. Harris reported "still having some significant radicular symptoms."  (Doc. 7-8, p. 58).  Dr. Givhan indicated that a "nerve injury related to her massive disc herniation" could cause some of Ms. Harris's symptoms.  Dr. Givhan ordered an MRI to explore the source of Ms. Harris's continued pain and to rule out recurrent disc herniation.  The ALJ did not address this visit in his analysis of the objective medical evidence.

Thus, the ALJ relied upon Dr. Givhan's July 8, 2014 note which reflected improvement in Ms. Harris's pain, but the ALJ did not mention a note later in the same month that supports Ms. Harris's pain testimony.  *See Iheanacho v. Berryhill*, No. 6:17-CV-0910-MHH, 2018 WL 4680173, at *6 (N.D. Ala. Sept. 28, 2018) (ALJ may not take a "snapshot" of notes that show immediate improvement and

then disregard notes that show the pain returning) (citing *Robinson v. Colvin*, No. 5:12-cv-1954-AKK, 2014 WL 2214294, at *5 (N.D. Ala. May 28, 2014)).

Dr. Bankston performed an MRI of Ms. Harris's spine on August 4, 2014. (Doc. 7-8, p. 62). Dr. Bankston reported a "mild to moderate diffuse disc bulge with mild facet degenerative change[,]" but he did not see evidence of a recurrent or residual disc herniation. (Doc. 7-8, pp. 62-63). On August 5, 2014, Ms. Harris returned to Dr. Givhan. (Doc. 7-8, p. 57). Dr. Givhan reported that the MRI scan did not "show any recurrent or residual disc herniation of the nerve root." (Doc. 7-8, p. 57). Dr. Givhan stated that "[t]here certainly is a chance that [Ms. Harris] has some long-standing nerve damage which . . . is playing a role in her symptoms at this point." (Doc. 7-8, p. 57). Dr. Givhan indicated that Ms. Harris should continue her therapy and "hope the nerve spontaneously heals itself." (Doc. 7-8, p. 57). Dr. Givhan explained to Ms. Harris that her partial foot drop and numbness might be permanent. (Doc. 7-8, p. 57). Although the ALJ reported that the MRI did not show recurrent disc herniation, the ALJ did not discuss Dr. Givhan's concerns about potential nerve damage.

As the ALJ indicated, the next record of treatment is dated nearly six months after Ms. Harris's August 2014 visit with Dr. Givhan.[2] Ms. Harris visited DCH

_____

[2] There is no indication that Ms. Harris stopped taking her pain medication during those six months. *See Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56, 64 (11th Cir. 2010) ("[T]he

Regional Medical Center on January 20, 2015, after falling. She reported severe back pain. (Doc. 7-9, p. 78). On January 29, 2015, Ms. Harris's primary care physician, Dr. Laubenthal, examined her for "numbness in [her] lower leg and feet swelling." (Doc. 7-8, pp. 91, 94). Ms. Harris reported that she had been experiencing the numbness for eight months, and she stated that "[t]he problem has been progressively worsening." (Doc. 7-8, p. 94). Dr. Laubenthal noted that Ms. Harris walked normally, exhibited a reduced sensation to touch in foot and ankle, and stood without difficulty. (Doc. 7-8, p. 96). According to Dr. Laubenthal's diagnosis, Ms. Harris was experiencing paresthesia and neuropathy in her left foot and radiculopathy in her back. (Doc. 7-8, p. 96).

On January 31, 2015, Dr. Summerlin, a consultative radiologist, examined Ms. Harris. (Doc. 7-9, pp. 3, 8). Dr. Summerlin noted that Ms. Harris's walking was moderately antalgic. (Doc. 7-9, p. 5).[3] Dr. Summerlin reported that Ms. Harris carried an unprescribed cane in her left hand. (Doc. 7-9, p. 5). The absence of a prescription does not mean that Ms. Harris's use of a cane is unnecessary. *See Iheanacho*, 2018 WL 4680173, at *4 n.2 (citing *Davis v. Berryhill*, No. 2:15-cv-1429-KOB, 2017 WL 1074451, at *9 (N.D. Ala. Mar. 20, 2017) ("[T]he lack of

---

[3] credibility of [the claimant]'s complaints of disabling pain are bolstered by evidence that she . . . was prescribed numerous medications.").

[3] Merriam-Webster's Medical Dictionary defines antalgic as: "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." Antalgic, MERRIAM-WEBSTER ONLINE MEDICAL DICTIONARY, https://www.merriam-webster.com/medical/antalgic (last visited Jan.16, 2019).

prescription does not necessarily indicate that a claimant does not require such a device.")).

Dr. Summerlin diagnosed Ms. Harris with "possible peripheral nerve injury with weakness in the left lower extremity." (Doc. 7-9, p. 7). This record undermines the ALJ's finding that Ms. Harris does not have peripheral neuropathy because "there is no such diagnosis within the evidentiary record from an acceptable medical source." (Doc. 7-3, p. 19). The ALJ discounted Dr. Summerlin's pain-related diagnosis and focused instead on Dr. Summerlin's functional assessment of Ms. Harris's ability to stand, walk, sit, and lift. (Doc. 7-3, p. 23).

Dr. Summerlin observed that Ms. Harris showed "consistent pain behavior" by "shift[ing] positions several times during the course of the 15 minute interview and subsequent 10 minute examination." (Doc. 7-9, p. 4). The ALJ did not acknowledge this evidence. (Doc. 7-3, p. 23).

In February and March of 2015, Ms. Harris sought treatment from Dr. Barr, a neurologist. (Doc. 7-9, pp. 30-31, 393). On February 25, 2015, Dr. Barr noted that Ms. Harris's EMG showed an "irritated nerve in her back [that] could be left over from last year." (Doc. 7-9, p. 31). Dr. Barr indicated that Ms. Harris showed "questionable effort" when he tested her left foot motor strength on March 30, 2015. (Doc. 7-9, p. 36). The ALJ relied on Dr. Barr's observation about Ms.

Harris's strength testing effort in his decision, but did not discuss Dr. Barr's opinion about nerve irritation in Ms. Harris's back. (Doc. 7-3, p. 25).

Dr. Barr diagnosed Ms. Harris with "a complex regional pain syndrome in the left leg secondary to her lumbar radiculopathy syndrome." (Doc. 7-9, p. 36). The ALJ classified Ms. Harris's complex regional pain syndrome as a non-severe impairment. (Doc. 7-3, pp. 18, 19).

Ms. Harris returned to Dr. Barr on March 30, 2015. (Doc. 7-9, pp. 35, 38). Dr. Barr indicated that Ms. Harris's nerve "[was] not healing well," and her pain was not improving; epidural blocks did not help. (Doc. 7-9, p. 35). Dr. Barr noted that Duloxetine was not easing Ms. Harris's pain, and Gabapentin "makes her sleepy if she takes higher than the dose she is on now." (Doc. 7-9, p. 35). Dr. Barr recommended that Ms. Harris switch from Gabapentin to Lyrica because Lyrica "sometimes has fewer sedating side effects." (Doc. 7-9, p. 36). The ALJ did not address Dr. Barr's March 30, 2015 notes in his decision.

In 2015, Ms. Harris continued to see Dr. Laubenthal and Dr. Graham, a spine and pain specialist. (Doc. 7-9, pp. 67-72; Doc. 7-9, pp. 99-105). Dr. Barr referred Ms. Harris to Dr. Graham. (Doc. 7-9, 95). In July of 2015, Ms. Hester, a certified registered nurse practitioner who works with Dr. Graham, described Ms. Harris's pain level as 7 out of 10 with medications. (Doc. 7-9, p. 102, 105). Ms.

Harris indicated that prolonged standing, sitting, walking, and bending aggravated her back pain and that medications and rest alleviated it.  (Doc. 7-9, p. 102).

In November of 2015, Ms. Harris visited Ms. Hester and reported a pain level of 6 out of 10 with medications.  (Doc. 7-9, p. 99).  Ms. Hester noted that Ms. Harris "continues to describe her [lower back pain] as a constant ache that radiates to bilateral hips and into [her left] leg."  (Doc. 7-9, p. 99).  Ms. Harris indicated that prolonged standing, sitting, walking, and bending aggravated her back pain and that medications and rest alleviated it.  (Doc. 7-9, p. 99).

In March of 2016, Ms. Harris visited Dr. Graham and described her pain level as 7 out of 10 with medications.  (Doc. 7-9, p. 95).  Ms. Harris reported that prolonged standing, sitting, walking, bending aggravated her pain and that medications and rest alleviated it.  (Doc. 7-9, p. 95).  Ms. Harris also indicated to Dr. Graham that she would become sleepy after taking Nucynta.  (Doc. 7-9, p. 95).  Dr. Graham decreased Ms. Harris's dosage from 75 mg to 50 mg.  (Doc. 7-9, p. 98).  Ms. Harris's report about the negative side effects she experiences from taking Nucynta is consistent with her hearing testimony.

As detailed above, the ALJ did not discuss or credit the many treatment records that corroborate Ms. Harris's subjective reports of pain.  *See Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990) ("In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence

favorable as well as unfavorable to the Secretary's decision.") (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Therefore, the ALJ's reliance upon the absence of objective evidence does not support his credibility determination.

### B. Daily Activities

In discrediting Ms. Harris's subjective pain testimony, the ALJ also relied upon Ms. Harris's report of her daily activities.  (Doc. 7-3, p. 25).  "An ALJ may not rely on a claimant's daily activities alone in making a disability determination." *Hill v. Comm'r of SSA*, No. 2:14-cv-01322-SGC, 2015 WL 5559758, at *5 (N.D. Ala. Sept. 18, 2015) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) ); *see also Sparks v. Colvin*, No. 2:12-cv-02092-LSC, 2013 WL 2635263, at *5 (N.D. Ala. June 10, 2013) ("The ALJ cannot use daily activities alone to determine whether a claimant is disabled.").  Procedurally then, this Court may not affirm the ALJ's decision solely on the basis of his evaluation of Ms. Harris's daily activities.  Moreover, substantial evidence does not support the ALJ's finding that Ms. Harris's daily activities diminish her credibility.

An ALJ may consider a claimant's daily activities when reaching a conclusion regarding credibility.  *See* 20 C.F.R. §§ 404.1529(c)(3) (listing "daily activities" as a relevant factor to consider in evaluating a claimant's subjective pain testimony).  The ALJ described Ms. Harris's daily activities as follows:

> Despite her impairments, the claimant readies her children for school, prepares simple meals, watches TV, performs routine household

> chores, helps her children with their homework, cares for her own personal needs with minimal assistance, drives a vehicle, visits with her family, shops for her household needs, attends her children's sporting events and handles her own financial affairs (Exhibits 6E and 7E).

(Doc. 7-3, p. 25). The ALJ characterized these daily activities as "essentially normal" and consistent with his RFC finding of non-skilled sedentary work. (Doc. 7-3, p. 25).

When examining daily activities, an ALJ must consider the record as a whole. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (Appeals Council erred in finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been significantly affected."). "[P]articipation in everyday activities of short duration, such as housework or fishing" will not preclude a claimant from proving disability. *Lewis*, 125 F.3d at 1441. Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television, embroider[s], attend[s] church, and drive[s] an automobile short distances . . . . performs housework for herself and her husband, and accomplishes other light duties in the home" still can suffer from a severe impairment).

The ALJ's description of Ms. Harris's daily activities is incomplete. For example, in January of 2015, Dr. Summerlin reported that Ms. Harris could:

> bathe herself but has difficulty putting on socks and shoes. She does light cooking activities as long as she can sit down. She does not clean[]. She can drive short distances and get a few groceries but reports that she is no longer able to walk through Wal-Mart.

(Doc. 7-9, p. 4). During the administrative hearing, Ms. Harris testified that she can drive for 20 minutes, but then must get out of the vehicle. (Doc. 7-3, p. 42). Ms. Harris explained that pain prevents her from doing much at home. (Doc. 7-3, p. 42). Ms. Harris stated that when she can manage to do a single load of laundry, she has to lie down to avoid leg pain. (Doc. 7-3, p. 42). Ms. Harris indicated she is able to cook in an oven, but not on the stove because standing hurts her back. (Doc. 7-3, p. 43).

The ALJ's discussion of Ms. Harris's daily activities does not include these limitations. Consequently, on remand, the ALJ must consider all of the evidence concerning Ms. Harris's daily activities.

## V.    CONCLUSION

The Court remands the Commissioner's decision for further administrative proceedings consistent with this memorandum opinion.

**DONE** this 15th day of February, 2019.

MADELINE HUGHES HAIKALA
UNITED STATES DISTRICT JUDGE